IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-00153-01-CR-W-FJG |
| | ) | |
| ZHE LI, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Zhe Li's Motion to Suppress Statements (doc #17). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On May 25, 2010, the Grand Jury returned a three count indictment against defendant Zhe Li. Count One of the indictment charges that on November 4, 2008, defendant Li transferred in interstate commerce a wire transfer of $15,299.58 which money had been stolen, converted, and taken by fraud from the Argosy Riverside Casino in Kansas City, Missouri, across state lines to Tampa, Florida. Count Two charges that on October 29, 30 and 31, 2008, defendant Li, for the purpose of evading the reporting requirements of 31 U.S.C. § 5313, knowingly and willfully structured a currency transaction, and did so as part of a pattern of illegal activity involving more than $100,000 in a 12-month period. Count Three charges that on August 13, 2008, defendant Li made a false statement of material fact to the United States Department of Agriculture.

On October 20, 2010, the undersigned conducted an evidentiary hearing on defendant Li's motion to suppress. Defendant Li was represented by retained counsel George J. Thomas, III. The

Government was represented by Assistant United States Attorneys Jalilah Otto and Gene Porter. The Government called Sergeants Chris Watson and Jeffrey Fitzgerald of the Missouri State Highway Patrol and Rodrick Madison, assistant store director for a Hy-Vee Food Store, as witnesses. Defendant Li testified on behalf of the defense.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Sergeant Chris Watson is employed with the Missouri State Highway Patrol's Gaming Division. (Tr. at 5) Sergeant Watson is a supervisor at the Argosy Casino in Riverside, Missouri. (Tr. at 5-6) Sergeant Watson handles criminal investigations at the casino. (Tr. at 7)

2. On December 15, 2008, Sergeant Watson received a phone call from a trooper, Greg Prussman, who worked at the casino. (Tr. at 10) Trooper Prussman advised that during that day, they had discovered some counterfeit $100 cheques (commonly referred to as chips) at one of the cages. (Tr. at 10-11) The subject, identified as Zhe Li, had cashed in 27 black $100 cheques. (Tr. at 18)

3. On December 16, 2008, Sergeant Watson was called by casino surveillance and informed that Zhe Li, the subject who passed the counterfeit chips the day before, had come into the casino. (Tr. at 11-12) Li then left the casino and came back a little before 11:00 a.m. (Tr. at 12) At approximately 11:01 a.m., Li went to the main cage and cashed in eight black $100 casino cheques. (Tr. at 12) This was captured on surveillance video. (Tr. at 12) Sergeant Watson went to the main cage, picked up the eight cheques, used ultraviolet light and determined that the cheques were counterfeit. (Tr. at 12-13) Sergeant Watson seized the cheques as evidence. (Tr. at 13)

4. At 1:35 p.m. on December 16, Zhe Li went to the high limit cage and cashed in nine black $100 casino cheques. (Tr. at 13) This was captured on surveillance video. (Tr. at 13) Sergeant Watson took the nine cheques to his office, used the ultraviolet light and identified all nine of the cheques as counterfeit. (Tr. at 13) Sergeant Watson contacted the Platte County Prosecutor's Office and told them that Li had passed seventeen counterfeit $100 cheques and that he was going to be placed under arrest. (Tr. at 14)

5. Sergeant Watson walked downstairs to the poker room where Zhe Li was playing a

2

table game and placed Li under arrest. (Tr. at 14-15) Li was placed in handcuffs. (Tr. at 15) Sergeant Watson was accompanied by casino security, but Watson was the only armed officer. (Tr. at 15) Sergeant Watson never displayed his weapon to Li. (Tr. at 20) Sergeant Watson testified that Li's demeanor was docile and polite. (Tr. at 15-16) There was an orange coat draped on the chair in which Li had been sitting. (Tr. at 16) Sergeant Watson testified that Li had been wearing an orange coat earlier in the day when he had come to the casino. (Tr. at 16) This had been captured on surveillance video. (Tr. at 16) Li acknowledged that the coat was his. (Tr. at 16) Sergeant Watson retrieved the coat. (Tr. at 16)

6. Sergeant Watson and Zhe Li walked toward Watson's office on the second floor. (Tr. at 16-17) As they started up the escalator, Li told Sergeant Watson that he was not feeling well and that he thought he was going to pass out. (Tr. at 17) At the top of the escalator, there was a table and several chairs. (Tr. at 17) Sergeant Watson walked Li over to a chair and sat him down. (Tr. at 17) Before Li sat down, Sergeant Watson searched Li's pockets and retrieved some cash from him. (Tr. at 17) Sergeant Watson then had an EMT from the casino come and check on Li. (Tr. at 17)

7. While the EMT was checking on Zhe Li, Sergeant Watson counted the cash he had retrieved from Li's pockets. (Tr. at 18) Li had $4,300 in cash, all $100 bills. (Tr. at 18) Sergeant Watson testified that based on the information he had received from Trooper Prussman, the day before, Li had cashed in 27 black $100 casino cheques. (Tr. at 18) Added to the 17 black $100 casino cheques Li had cashed that day, the total was $4,400. (Tr. at 18) Sergeant Watson also discovered 83 black $100 casino cheques in Li's coat pocket. (Tr. at 18) Sergeant Watson later verified with an ultraviolet light that these cheques were counterfeit. (Tr. at 19) Li testified that he was asked by the officers where the cash on his person and the chips in his coat came from prior to the medical assistant checking him. (Tr. at 81-82)

8. Zhe Li was with the EMT for five to ten minutes. (Tr. at 20) After the EMT said Li was okay, Sergeant Watson walked Li over to his office. (Tr. at 20) Sergeant Watson testified that they went into Watson's office at approximately 2:15 p.m. (Tr. at 39) Based on his personal observations and the EMT saying that Li was fine, Sergeant Watson felt Li was fit to continue with questioning. (Tr. at 39, 43) Sergeant Watson testified that Li's handcuffs were removed. (Tr. at 40) Li testified that he remained handcuffed during the questioning. (Tr. at 84) Sergeant Watson read the following Miranda rights form to Li at approximately 2:30 p.m:

   MISSOURI STATE HIGHWAY PATROL
   NOTIFICATION OF RIGHTS

   BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS; THEY ARE:

> You have the right to remain silent. \_\_\_
>
> Anything you say can be used against you in court. \_\_\_
>
> You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning. \_\_\_
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. \_\_\_
>
> If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. \_\_\_
>
> I UNDERSTAND MY RIGHTS. Signed _____

(Tr. at 39; Government's Ex. 1) Li wrote his initials on the line after each statement to signify that he understood each of the rights. (Tr. at 22-23) Li signed his name on the line following the statement "I UNDERSTAND MY RIGHTS." (Tr. at 23-24) Sergeant Watson testified that Li was polite and docile and paid attention to what Watson was saying as Watson read Li his Miranda rights. (Tr. at 25) Sergeant Watson testified that Li appeared to be able to follow along with what Watson was saying. (Tr. at 25) Li testified that he had never been arrested either in the United States or China and that he was scared. (Tr. at 85) Li testified that while the form was read to him, he did not understand what was going on. (Tr. at 85) No one asked Li if he needed an interpreter. (Tr. at 85) Li testified that he did not ask for an interpreter because he did not know he could have one. (Tr. at 85)

9. Sergeant Watson has interviewed persons who have acquired English as a second language. (Tr. at 9) Sergeant Watson has used interpreters when he felt it necessary. (Tr. at 9) Sergeant Watson did not use an interpreter in the case of Zhe Li because Li spoke to Watson in English. (Tr. at 9) Sergeant Watson testified that if it had appeared that Li was not understanding what Watson was saying or reading to him, Watson would have gotten him an interpreter. (Tr. at 25-26) Sergeant Watson testified that Argosy Casino has employees from almost every country, hence, there is an interpreter for just about every language at the casino. (Tr. at 26) At no point did Li indicate that he did not understand what was going on or that he did not understand what Sergeant Watson was saying. (Tr. at 26) Sergeant Watson testified that no one, other than Watson, asked Li any questions. (Tr. at 22) Sergeant Watson did not feel an interpreter was necessary. (Tr. at 39) Li testified that in addition to Sergeant Watson, two other people were present in the small office during the questioning. (Tr. at 84)

10. Zhe Li signed a Waiver of Rights at 2:35 p.m. (Tr. at 26-27; Government's Ex. 2)

4

The form read:

## MISSOURI STATE HIGHWAY PATROL
## WAIVER OF RIGHTS

> Having read the statement of my rights and understanding them, I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force or [sic] any kind has been used against me. I understand the English language.

(Government's Ex. 2) On the form, Li indicated that he was 35 years of age, that he had attended school through the 14th grade level and that he was not employed. (Tr. at 27-28; Government's Ex. 2) According to Li, when he signed the Notification of Rights and Waiver of Rights forms, he thought they were just forms acknowledging his arrest. (Tr. at 86) Li testified that in China, if you are placed under arrest, you have to sign a paper. (Tr. at 110) Li has never been arrested in China, yet he knew the customs of being arrested in China. (Tr. at 110-111) Li testified that he did not understand the rights in the Notification of Rights because this had never happened to him before. (Tr. at 111) Li testified that the only right he knew about was that he had the right to ask for an attorney. (Tr. at 89)

11. After Zhe Li waived his rights, Sergeant Watson spoke with Li about the cash and casino chips he had in his pockets. (Tr. at 28-29) Sergeant Watson testified that Li told him that the cash and chips came from a jackpot. (Tr. at 29) Sergeant Watson told Li that it would be easy to prove or disprove whether he won a jackpot. (Tr. at 29) Sergeant Watson testified that Li then changed his story to say that he had found the chips along the road somewhere in a bag. (Tr. at 29) Li admitted that he first told Sergeant Watson that he had won the chips at the casino. (Tr. at 87) After Sergeant Watson told Li that the chips were counterfeit, Li testified that he then said he had found the chips on the road. (Tr. at 87) Li testified that when he said "jackpot," he meant it as a figure of speech, that he felt like he had won the jackpot when he found the chips. (Tr. at 88) Li testified that if he had actually won a jackpot over $1,200, he would have had to fill out a form for tax purposes. (Tr. at 88)

12. While most of Zhe Li's responses to Sergeant Watson were merely "yes" and "no" answers, Li did give a narrative response when he told Watson that he had found the bag of chips along the side of the road. (Tr. at 30) Li only spoke to Sergeant Watson in English. (Tr. at 30) Sergeant Watson testified that he had no difficulty understanding Li and Li appeared to have no difficulty understanding what Watson was saying. (Tr. at 30) Li never asked for a translator. (Tr. at 30) Li testified that there were three people in the room while he was being questioned; Sergeant Watson sat on the desk and two others were behind Li. (Tr. at 84) The interview lasted approximately twenty minutes. (Tr. at 31, 88) Sergeant Watson testified that he did

5

not threaten Li in any way. (Tr. at 41) Sergeant Watson did not tell Li that he or his wife would be deported. (Tr. at 41) Sergeant Watson testified that Li's statements were given freely and voluntarily. (Tr. at 32-33)

13. Zhe Li testified that Sergeant Watson did not threaten him, but another officer (Li thinks he identified himself as a detective) asked to speak to him privately. (Tr. at 89) This other officer told Li that he did not think Li's story was believable, but that a jury would decide if it believed Li's story in court. (Tr. at 90) The officer told Li that if he went to jail, his wife would be deported. (Tr. at 90) Li testified that he was scared by what the officer told him. (Tr. at 90)

14. Zhe Li was photographed and fingerprinted at the casino as part of the arrest process. (Tr. at 31) Sergeant Watson asked for and received Zhe Li's verbal consent to search Li's vehicle which was in the parking lot. (Tr. at 31)

15. Sergeant Watson and Trooper Leonard Reed transported Zhe Li to the Platte County Sheriff's Department. (Tr. at 31) Before going to the Sheriff's Department, they stopped at Li's apartment as Li had consented to the officers searching the apartment. (Tr. at 31-32)

16. After Sergeant Watson's testimony was concluded, the Court inquired as to whether defendant Li was understanding the proceedings as there did not appear to be any interpreting being done by the interpreter who was present to interpret if necessary. (Tr. at 44-45) Defense counsel stated that Li was satisfied with his comprehension of the proceedings. (Tr. at 44-45)

17. On December 17, 2008, Sergeant Jeffrey Fitzgerald, of the Missouri State Highway Patrol's Gaming Division, contacted Sergeant Watson to see if he needed any assistance with the investigation of Zhe Li. (Tr. at 47) Sergeant Watson gave Sergeant Fitzgerald a brief synopsis of what had occurred. (Tr. at 48) Sergeant Fitzgerald told Sergeant Watson that he had some contacts from whom he could gather some background information. (Tr. at 48) Sergeant Fitzgerald contacted the Department of Social Services and was able to pull some background information on Li, such as employment history, residence, family, whether he was receiving assistance from the state, etc. (Tr. at 48)

18. Sergeant Watson told Sergeant Fitzgerald that the hold on Zhe Li would expire shortly. (Tr. at 49) Sergeant Fitzgerald and Corporal Brian Holcomb went to the Platte County Sheriff's Department to speak to Li. (Tr. at 49) Li was brought to a room where he spoke with Sergeant Fitzgerald and Corporal Holcomb. (Tr. at 50) The room was nondescript, measuring 10 by 10 or 12 by 12, with a table in the center and chairs around the table. (Tr. at 50) Only Sergeant Fitzgerald, Corporal Holcomb and Li were in the room. (Tr. at 50-51) Li was not handcuffed. (Tr. at 51)

19. When Zhe Li was brought into the room, Sergeant Fitzgerald and Corporal Holcomb introduced themselves and explained that they were there to assist with the investigation of the chips that were found in Li's possession. (Tr. at 53) Li was presented with a copy of the Missouri State Highway Patrol Notification of Rights form. (Tr. at 54) The form provided:

    MISSOURI STATE HIGHWAY PATROL
    NOTIFICATION OF RIGHTS

    BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS; THEY ARE:

    You have the right to remain silent. ___

    Anything you say can be used against you in court. ___

    You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning. ___

    If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. ___

    If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. ___

    I UNDERSTAND MY RIGHTS. Signed _____

    (Tr. at 39; Government's Ex. 3) After Sergeant Fitzgerald read each line, Li wrote his initials on the line after each statement to signify that he understood each of the rights. (Tr. at 55-56; Government's Ex. 3) Li indicated that he understood his rights and signed his name. (Tr. at 56; Government's Ex. 3) Corporal Holcomb witnessed Li's signature. (Tr. at 56; Government's Ex. 3) Sergeant Fitzgerald testified that Li seemed pretty relaxed. (Tr. at 56) Li testified that he signed the form because the officers told him that he would be released if he cooperated with them. (Tr. at 92)

20. Sergeant Fitzgerald began by asking Zhe Li background questions. (Tr. at 57) Li indicated that he was originally from China and that he had come to the United States in 1993. (Tr. at 57) Sergeant Fitzgerald asked Li how he came into possession of the casino chips. (Tr. at 57-58) Li said that he had found them on the side of the road. (Tr. at 58) Li provided a certain amount of detail, that is on November 13, in the evening sometime after 5:00 p.m., Li had seen a trash bag on the side of the service road in front of the casino. (Tr. at 58) According to Li, inside the trash bag was an additional travel bag containing clothing, beer and the counterfeit chips. (Tr.

at 58) Li said he threw everything in a dumpster at his apartment complex with the exception of the chips. (Tr. at 58)

21. Sergeant Fitzgerald asked Zhe Li why he stopped to check inside of a trash bag. (Tr. at 59) Li told Sergeant Fitzgerald that he saw the chips. (Tr. at 59) Sergeant Fitzgerald told Li that he found this hard to believe since all these other items were in the trash bag and Li was on the opposite side of his large SUV. (Tr. at 59) Sergeant Fitzgerald testified that the light would have been failing as sunset was shortly after 5:00 p.m. on November 13, 2008. (Tr. at 59) Sergeant Fitzgerald asked Li if Li were in Fitzgerald's shoes, would he believe Li's story that he could see what he claimed to have seen from his vehicle. (Tr. at 58) Sergeant Fitzgerald testified that Li stated that it was "unbelievable." (Tr. at 58) Li testified that he told Sergeant Fitzgerald that it was unbelievable, but that it was the truth. (Tr. at 93) Sergeant Fitzgerald asked Li why he had originally told Sergeant Watson that he hit a jackpot and Li responded that he was scared. (Tr. at 59)

22. Zhe Li originally told Sergeant Fitzgerald that he had approximately $10,000 worth of $100 cheques. (Tr. at 60) Li later changed the amount to $100,000 or more. (Tr. at 60)

23. Sergeant Fitzgerald testified that he has interviewed 100 or more people for whom English is a second language. (Tr. at 52) According to Sergeant Fitzgerald, at the casino, it is a regular occurrence. (Tr. at 52) Sergeant Fitzgerald had interrogated or questioned Chinese nationals prior to interviewing Zhe Li. (Tr. at 67) Sergeant Fitzgerald testified that if there does not appear to be a communication issue or barrier, he does not use a translator. (Tr. at 53) In the past, if Sergeant Fitzgerald has begun an interview and then realized that a translator was needed because the individual had trouble understanding what Sergeant Fitzgerald was saying or Sergeant Fitzgerald had trouble understanding what the individual was saying, a casino employee has provided interpretive services. (Tr. at 53)

24. Sergeant Fitzgerald testified that he spoke with Zhe Li for less than an hour. (Tr. at 60) Li's responses to Sergeant Fitzgerald's questions consisted of both narrative responses and "yes" and "no" answers depending on the question asked. (Tr. at 60) Sergeant Fitzgerald testified that he had no difficulty understanding Li and Li appeared to have no difficulty understanding Fitzgerald. (Tr. at 60) Their entire conversation was in English. (Tr. at 60-61) Li never requested a translator and Sergeant Fitzgerald never felt the need to get a translator. (Tr. at 61) Sergeant Fitzgerald testified that the only confusion which arose during the interview was when Fitzgerald asked if Li would be willing to take a polygraph and Li stated he was unsure of whether a polygraph would injure him. (Tr. at 61) Sergeant Fitzgerald tried to give Li a brief description of a polygraph, but then told Li he could research it or ask someone that he trusted to explain that it would not injure him in any way and that he could then contact the officers and they would set one up.

(Tr. at 61-62)

25. After the interview, Sergeant Fitzgerald notified the Platte County Sheriff's Department that the officers were not seeking a warrant so Zhe Li could be released. (Tr. at 62) Li asked Sergeant Fitzgerald and Corporal Holcomb if they would provide him a ride home. (Tr. at 62) On the way to Li's home, the officers asked Li if he had a computer at home. (Tr. at 62-63) Li said that he did. (Tr. at 63) Sergeant Fitzgerald thought there might possibly be some evidentiary information on it so he asked Li if the officers could look at it. (Tr. at 63) When the officers and Li arrived at Li's apartment, Li said he wanted to go up alone and tell his wife what was going on before he asked the officers to come up. (Tr. at 63) The officers waited in the parking lot for five to ten minutes until Li motioned for them to come up. (Tr. at 63) When the officers went up to the apartment, Li indicated that his wife had given the computer to someone in China. (Tr. at 63-64) Li showed the officers an area in his bedroom where the computer used to be. (Tr. at 64)

26. Sergeant Fitzgerald testified that he never threatened Zhe Li. (Tr. at 64) Sergeant Fitzgerald testified that besides the issue of the polygraph, Li never appeared to be confused. (Tr. at 64) Sergeant Fitzgerald testified that Li never appeared to be afraid. (Tr. at 64)

27. Sergeant Fitzgerald testified that he did not see defendant Li confer with the interpreter about any of the questions directed to Fitzgerald or about any of Fitzgerald's answers during his direct testimony at the hearing. (Tr. at 64)

28. Rodrick Madison, assistant store director of the Hy-Vee store at I-29 and Barry Road in Kansas City, Missouri, testified that Zhe Li was the manager of the Chinese department in the store from April 2007 to June 2008. (Tr. at 71) Mr. Madison testified that in applying for the position at Hy-Vee, Li had filled out an employment application that was printed in English. (Tr. at 72) Li filled in the handwritten portions of the application in English. (Tr. at 72) As manager of the Chinese department, Li had customer service responsibilities which included serving customers from the hot case, taking special orders from customers and making sure that customers' needs were being met. (Tr. at 73) Mr. Madison observed Li interacting with customers. (Tr. at 73) Li's conversations with customers were in English. (Tr. at 73) Mr. Madison received no complaints from customers that they were unable to understand Li. (Tr. at 73) Mr. Madison also observed Li supervising employees in the Chinese department and testified that Li interacted with these employees in English. (Tr. at 74) Li had supervisory responsibilities such as preparing schedules for the employees under him and Li prepared these schedules in English. (Tr. at 74)

29. In the fourteen months Zhe Li worked at Hy-Vee, Mr. Madison testified that he interacted with Li on a daily or every-other-day basis. (Tr. at 74) Mr. Madison

9

testified that he never had any difficulty communicating with Li either orally or in writing. (Tr. at 75) All of their communications were in English. (Tr. at 75)

30. Zhe Li admitted during cross-examination at the hearing that he had not utilized the assistance of the interpreter during the testimony of Sergeant Watson, Sergeant Fitzgerald or Mr. Madison. (Tr. at 95) During the entire hearing, Li only utilized the interpreter for one question that was asked of him by his own attorney. (Tr. at 95)

31. Zhe Li admitted that he has filled out and signed a Missouri Department of Social Services Family Support Division Application for Food Stamp Benefits (Government's Ex. 5), a Missouri Department of Social Services Family Support Division Employment Information Request (Government's Ex. 6) and a Missouri Department of Social Services MO Healthnet Application for Kids (Government's Ex. 7). (Tr. at 99-101, 103-104) Li has also signed various documents with respect to the purchase of a 2007 Hummer. (Tr. at 105-107; Government's Exs. 8-14) Li testified that he understood that by signing one of the documents he was giving permission to have his credit checked. (Tr. at 107-108)

## III. DISCUSSION

Defendant Li seeks to suppress all his statements, and any evidence in any form constituting the fruits of such statements, to law enforcement officers on December 17 and 18, 2008. (Defendant's Motion to Suppress Statements at 1) Defendant argues that these statements were elicited in violation of his constitutional rights under the Fifth and Fourteenth Amendments. (Id.)

The subject statements (which defendant Li gave in English) were made after defendant was given his Miranda warnings in English. There was no evidence presented that defendant was coerced, intimidated or incapacitated in any way when he was given his Miranda rights or when he gave his statements, nor that defendant's waiver of these rights was anything other than voluntary. Officer Watson testified that Li paid attention to what Watson was saying as Watson read Li his Miranda rights and Li appeared to be following what Watson was saying.[1] (See Fact No. 8, supra)

---

[1] The Court does not find defendant Li's testimony credible that because he had never been arrested, he did not understand what was going on and just signed the forms because in China, if one is placed under arrest, one must sign a paper (see Fact Nos. 8 and 9, supra).

10

At no point did Li indicate that he did not understand what was going on or that he did not understand what Sergeant Watson was saying. (See Fact No. 9, supra) Li admitted at the hearing that he knew he had the right to ask for an attorney. (Id.) The interview with Sergeant Watson lasted only twenty minutes. (See Fact No. 12, supra) Sergeant Watson did not threaten Li in any way. (Id.) With respect to the interview the following day by Sergeant Fitzgerald and Corporal Holcomb, Fitzgerald testified that Li seemed pretty relaxed. (See Fact No. 19, supra) The interview lasted less than an hour. (See Fact No. 24, supra) Sergeant Fitzgerald testified that he did not threaten Li and Li never appeared to be afraid. (See Fact No. 26, supra) Li was apparently comfortable enough with the officers to ask them for a ride home. (See Fact No. 25, supra) Further, Li was not new to the United States; he had lived in the United States since 1993. (See Fact No. 20, supra) Li was 35 years old at the time he was interviewed and had attended school through the 14th grade level. (See Fact No. 10, supra) Li had previously filled out (in English) and signed various forms while living in the United States, such as employment applications, applications for state aid and documentation regarding the purchase of an automobile. (See Fact Nos. 28 and 31, supra)

As for the fact that the Miranda warnings were given in English, the evidence presented at the hearing clearly establishes that defendant Li was able to speak and understand English. Defendant Li's former employer, who had almost daily contact with Li for over a year, testified that he never had any difficulty communicating with Li either orally or it writing and that all their communications were in English. (See Fact No. 29, supra) Twice, defendant Li indicated that he understood each of the Miranda rights as they were being read to him in English, by writing his initials on the line after each statement. (See Fact Nos. 8 and 19, supra) Twice, defendant Li signed his name on the line following the statement "I UNDERSTAND MY RIGHTS." (See Fact Nos. 8

11

and 19, supra)  During both interviews, defendant Li conversed with the officers in English.  (See Fact Nos. 12 and 24, supra)  Sergeant Watson and Sergeant Fitzgerald both have experience in interviewing persons who have acquired English as a second language.  (See Fact Nos. 9 and 23, supra)  Neither Sergeant Watson nor Sergeant Fitzgerald felt it necessary to obtain the services of an interpreter because the officers had no difficulty understand defendant Li and Li appeared to have no difficulty understanding the officers.  (See Fact Nos. 9, 12 and 24)  In both interviews, defendant Li's responses consisted of both narrative responses and "yes" and "no" answers depending on the question asked.  (See Fact Nos. 12 and 24, supra)  Li admitted during cross-examination at the hearing that he had not utilized the assistance of the interpreter provided for the hearing during the testimony of Sergeant Watson, Sergeant Fitzgerald or Mr. Madison.  (See Fact No. 30, supra)

In Bram v. United States, 168 U.S. 532, 542-43 (1897), the United States Supreme Court held that the voluntariness of a confession depends upon whether the confession was "extracted by any sort of threats of violence, obtained by any direct or implied promises however slight, [or] by the exertion of any improper influence."  In Schneckloth v. Bustamonte, 412 U.S. 218 (1973), the Court explained the voluntariness test:

> Is the confession the product of an essentially free and unconstrained choice by its maker?  If it is, if he has willed to confess, it may be used against him.  If it is not, his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

Id. at 225.  Whether or not a confession is made freely and voluntarily must be determined in light of the totality of the circumstances.  See United States v. Hyles, 479 F.3d 958, 966 (8th Cir. 2007); United States v. Warbonnet, 750 F.2d 698, 700 (8th Cir. 1984); Rachlin v. United States, 723 F.2d 1373, 1377 (8th Cir. 1983).

Based on the evidence outlined above, the Court finds that defendant Li was fully advised

12

of his rights, that he understood his rights and that he voluntarily and intentionally waived those rights and agreed to talk to the officers. Defendant's motion to suppress statements must fail.

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's Motion to Suppress Statements (doc #17).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                  */s/ Sarah W. Hays*
                                                  SARAH W. HAYS
                                  UNITED STATES MAGISTRATE JUDGE